# IN THE SUPREME COURT OF IOWA

No. 101 / 05-0818

Filed October 27, 2006

**CITY OF ASBURY, IOWA,**

Appellee,

vs.

**THE IOWA CITY DEVELOPMENT BOARD,**

Appellant.

and

**CITY OF DUBUQUE,**

Intervenor-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Lawrence H. Fautsch, Judge.

A city appeals the district court's decision nullifying the city's annexation of adjacent land. **REVERSED.**

Thomas J. Miller, Attorney General, and Michael H. Smith, Assistant Attorney General, for appellant Iowa City Development Board.

Frank Murray Smith, of Frank Smith Law Office, Des Moines, and Barry A. Lindahl, Dubuque, for appellant City of Dubuque.

Thomas Henderson, John F. Fatino, and Karin M. Sinnard of Whitfield & Eddy, P.L.C., Des Moines, for appellee.

**STREIT, Justice.**

When does a carrot become a stick? Competing for common ground, the City of Asbury objects to the tactics the City of Dubuque used to voluntarily annex land. After the City Development Board[1] (CDB) approved Dubuque's annexation application, Asbury appealed to the district court arguing Dubuque's application should have been dismissed because Dubuque coerced property owners into consenting to the annexation by offering them tax and other financial benefits conditioned on each property owner's consent. In response, Dubuque argued the offered benefits merely encouraged property owners to consent to annexation. The district court agreed with Asbury and found Dubuque's annexation process invalid. Because we find Dubuque's tactics were not prohibited by law, we reverse.

## I. Facts and Prior Proceedings

Asbury is west of Dubuque. An irregular gap exists between the two cities. The territory at issue in this case is between the western boundary of Dubuque and the southern boundary of Asbury.

Callahan Construction, which owns approximately 114 acres of unincorporated land in this area, asked Dubuque to annex its land in order to facilitate the development of a housing subdivision. Dubuque also received annexation requests from various members of the Bahl family, who separately own several parcels of land totaling approximately 408 acres, which is most of the remaining unincorporated land between Dubuque and Asbury. Dubuque could not annex the Bahl and Callahan properties without also annexing the surrounding parcels of property.

---

[1]"The City Development Board is the administrative board established to exercise administrative jurisdiction over annexation petitions." *Dunn v. City Dev. Bd.*, 623 N.W.2d 820, 821 (Iowa 2001) (citing Iowa Code § 368.9 (1997)).

This is because the annexation of the Bahl and Callahan properties alone would have created "islands" of unincorporated land, which is prohibited by statute. *See* Iowa Code § 368.7(3) (Supp. 2003)[2] ("The [CDB] shall not approve an application which creates an island."); *id.* § 368.1(10) (defining an island as "land which is not part of a city and which is completely surrounded by the corporate boundaries of one or more cities"). As a result, Dubuque pursued the annexation of twenty-nine parcels of land or approximately 704 acres. Callahan Construction owns two of these parcels (114 acres) and the Bahl family in total owns seven (408 acres). The remaining twenty parcels amount to 168 acres. Dubuque's annexation also included fifteen acres of county roads.

Dubuque sought annexation consents from the owners of the remaining twenty parcels in the proposed territory. Dubuque's city manager and several Dubuque employees attempted to personally contact each property owner in the annexation territory in order to discuss the annexation and the transition benefits Dubuque was proposing.[3] Additionally, the city manager attended a neighborhood meeting with about thirty people in attendance.

In an effort to entice the property owners in the proposed territory to consent, Dubuque offered the following transition benefits to the property owners within the territory: (1) a five-year partial exemption from city property taxes; (2) a reduced cost to voluntarily connect to Dubuque sanitary sewer lines; (3) a reduced cost to connect to Dubuque water lines; (4) consideration by Dubuque to enlarge Middle Road; and

---

[2]All references to the Iowa Code are to the 2003 Supplement unless otherwise indicated.

[3]It is unclear from the record how many individuals were actually contacted. The city manager told the CDB Dubuque "made a very strong effort" to meet with individuals face-to-face and answer questions.

(5) deferral of any sewer connection costs until the property is sold. These benefits were explained in an agreement entitled "Agreement between and among the City of Dubuque, Iowa and Certain Property Owners in Dubuque County, Iowa" ("Agreement"). The Agreement was sent to each property owner along with a letter from Dubuque's city manager dated August 8, 2003.[4] In his letter, the city manager explained "only those property owners who choose to sign this Agreement [i.e. consent to Dubuque's annexation] will be entitled to the benefits of this Agreement." The Agreement gave the property owners until August 14, 2003 to respond. In the accompanying letter, the city manager stated "[h]opefully, all of the property owners will sign this Agreement and return it to my office not later than 5:00 p.m. on August 13, 2003 so that it may be placed on the Agenda for the Dubuque City Council meeting of August 18, 2003."

In the end, twenty-one of the twenty-nine property owners (representing 643 acres) signed the Agreement and consented to Dubuque's annexation. The owners of the non-consenting parcels asked Asbury to annex their land. Asbury agreed and on December 16, 2003, Asbury filed an application for voluntary annexation with the CDB. On January 9, 2004, Dubuque filed its voluntary annexation application with the CDB for approximately 704 acres which included the land in Asbury's application. The CDB directed the two cities to meet and try to resolve their competing annexation proposals. After the two cities were

---

[4]It is also unclear how much time spanned between the initial contacts and the August 8 letter. One property owner, Francis McDonald, told the CDB Dubuque "gave us about three weeks to make up our mind if we wanted to join the City of Dubuque voluntarily [inaudible]."

unable to reach a compromise, the CDB dismissed Asbury's application because it would have created a proscribed island.

The CDB proceeded with Dubuque's application and conducted a public hearing in Dubuque on April 1, 2004. In its presentation to the CDB, Dubuque explained the necessity of the annexation as well as the services Dubuque would provide to the territory.

At the CDB hearing, Asbury objected to Dubuque's annexation application. Asbury accused Dubuque of "bad faith" in obtaining the consents of property owners in the proposed territory. Asbury claimed Dubuque did not give the property owners adequate time to consider the proposal. Asbury's biggest concern, however, was that Dubuque conditioned the receipt of transition benefits on each property owner's consent. Asbury argued this amounted to "undue pressure" and questioned the voluntariness of the property owners' consents.

Additionally, several property owners within the proposed territory spoke at the hearing. Members of the Bahl family spoke in favor of the annexation. Other property owners spoke against the annexation. For example, Joe and Mary Behnke through their attorney said they felt "pressured and coerced by the representatives of [Dubuque]" to annex their land. Francis McDonald told the CDB he signed the Agreement "under duress" in order to get the tax benefits.[5] Another property owner, Pete Henkels, compared the conditioning of benefits on a property owner's consent to "bribery or extortion." Douglas Fritch also spoke out

---

[5]Mr. McDonald used more force in his letter to the CDB. There, he claimed the Dubuque employees told differing stories to the various property owners in the territory. He stated "[t]his whole land grab is money driven by owners of four farms who want to develop their land. When [Dubuque's city manager] states 93% of the land and owners are signed up this is a 'Trojan horse.' If it weren't for the City's all out campaign for this program, the City of Dubuque would have only six property owners out of 26 who are affected. We believe this is taking a very undemocratic approach to this situation."

against the "unethical treatment" of him and his neighbors by Dubuque. According to Mr. Fritch, Dubuque estimated it would cost him about $10,000 for "mandatory sewer hookup." He signed the Agreement only to defer that "huge cost" until he sold his property. Mr. Fritch also said that he wanted to include a notation on the Agreement that he was reluctantly signing but Dubuque would not let him. In response to a question by one of the CDB members, Dubuque reiterated its intention to give the tax abatement only to the property owners in the territory who consented to annexation.

Shortly after the public hearing, Dubuque's City Council passed Resolution No. 174-04 which extended the transition benefits to those property owners in the territory who had *not* consented to annexation. Thereafter, Dubuque presented the CDB with a copy of the Resolution.

The CDB met in Des Moines to deliberate and determine Dubuque's annexation request. At least four-fifths of the CDB members voted to approve the annexation as required by Iowa Code section 368.7(1)(*f*). The CDB filed its written decision concerning the matter on July 7, 2004.

Asbury filed a petition for judicial review in the district court for Dubuque County. Based on the record, the district court reversed the CDB's decision approving Dubuque's annexation. The district court found the annexation process invalid because Dubuque "unfairly induced the property owners to the extent it placed the property owners in a position of either agreeing to the annexation and receiving financial benefits, or being denied financial benefits for refusing to agree to the annexation." Dubuque and the CDB appealed.

## II.  Standard and Scope of Review

Iowa's city development statute specifically limits judicial review of a CDB decision.  It states:

> The judicial review provisions of this section and chapter 17A shall be the exclusive means by which a person or party who is aggrieved or adversely affected by agency action may seek judicial review of that agency action. The court's review on appeal of a decision is limited to questions relating to jurisdiction, regularity of proceedings, and whether the decision appealed from is arbitrary, unreasonable, or without substantial supporting evidence. The court may reverse and remand a decision of the board or a committee, with appropriate directions.

Iowa Code § 368.22 (2003).  "On appeal, we decide whether the district court correctly applied the law."  *Pruss v. Cedar Rapids/Hiawatha Annexation Special Local Comm.*, 687 N.W.2d 275, 279 (Iowa 2004).  If we reach the same conclusions as the district court, we affirm; if not, reversal may be required.  *Id.*

"The law of annexation is purely statutory."  *Id.*  Nevertheless, substantial compliance with our annexation statutes is sufficient.  *City of Des Moines v. City Dev. Bd.*, 473 N.W.2d 197, 200 (Iowa 1991).  We liberally construe "legislation establishing the method by which municipal corporate boundaries may be extended . . . in favor of the public."  *Id.*

## III.  Merits

The question presented in this case is whether a city may offer tax and other financial benefits to property owners on the condition they consent to their properties' inclusion in an 80/20 annexation.  The district court answered this question in the negative.  The district court found Dubuque's annexation was "irregular" for three reasons.  First, it held section 368.7(3), which explicitly allows city councils to offer

property owners in a proposed territory a partial tax exemption, only applies to 100% voluntary annexations. The district court reasoned that even if section 368.7(3) does apply to 80/20 annexations, it does not allow a city to discriminate between consenting and non-consenting property owners. Second, the district court held Dubuque did not have the authority under chapter 368 of the Code to offer other financial benefits, such as a reduction in sewer and water hook-up costs and the deferral of sewer hook-up costs until the property is sold. Finally, the district court held Dubuque's annexation was not in fact voluntary due to "coercive and unfair practices" by the city. The court stated:

> Since the City of Dubuque unfairly induced the property owners to the extent that it placed the property owners in a position of either agreeing to the annexation and receiving financial benefits, or being denied financial benefits for refusing to agree to the annexation, it must be concluded that the annexation process was invalid. The City of Dubuque placed the property owners in a position in which the refusal to sign the annexation petition would make them unequal to their neighbors. Under these facts it cannot be said that the annexation proceedings were "voluntary" under Iowa Code Section 368.7.

On appeal, Dubuque and the CDB argue the district court erred in all three holdings. We address each holding in turn.

At the outset, we note our ruling is largely confined to this case because during the pendency of this appeal, the legislature amended several relevant provisions of the Iowa Code. We discuss the legislative changes below.

## A. Background on Voluntary Annexations

It may be helpful if we first discuss voluntary annexation in general before addressing the district court's ruling. Section 368.7 of the Iowa Code governs voluntary annexations of territory. There are two

types of voluntary annexations—100% annexations and 80/20 annexations. In a 100% voluntary annexation, all of the property owners in the territory request the adjoining city to annex their land. Iowa Code § 368.7(1)(*a*). In contrast, an 80/20 annexation includes some land whose owner did not request or consent to annexation. The annexation is still "voluntary" if the owners of at least 80% of the property in the proposed territory consent to annexation and the inclusion of the non-consenting property is necessary to "avoid creating an island or to create more uniform boundaries." *Id.*

All voluntary annexations require approval by the annexing city via a resolution by the city council. *See id.* § 368.7(1)(*d*), (2), (3). Approval by the City Development Board ("CDB") may also be required depending on the type of voluntary annexation. The CDB must approve a city's annexation if the proposed territory is within the urbanized area of another city. *Id.* § 368.7(3); *see id.* § 368.1(16) (defining "urbanized area" as "any area of land within two miles of the boundaries of a city"). Additionally, any 80/20 annexation, irrespective of whether it is within the urbanized area of another city, requires approval by four-fifths of the members of the CDB after a public hearing. *Id.* § 368.7(1)(*f*). The CDB may only approve an application that substantially complies with the statutory requirements for annexations. *City of Waukee v. City Dev. Bd.*, 590 N.W.2d 712, 716-17 (Iowa 1999) (quoting *Gorman v. City Dev. Bd.*, 565 N.W.2d 607, 609 (Iowa 1997)).

From a city's perspective, a voluntary annexation is preferable to an involuntary annexation for at least two reasons. First, only involuntary annexations require an election. *See* Iowa Code §§ 368.11-

.20 (2003).[6] Second, applications for voluntary annexation are expressly afforded a presumption of validity. *Id.* § 368.6. Thus, it is not surprising Dubuque made every effort to get the owners of at least 80% of the land in the proposed territory to consent to annexation. We now consider whether Dubuque's efforts were proper.

### B. Section 368.7(3) and 80/20 Voluntary Annexations

Section 368.7 governs voluntary annexations of territory. At the time of Dubuque's annexation proceedings, section 368.7 had four subsections.[7] The parties disagree on whether subsection 3, which allows a city to offer a partial tax exemption to property owners, applies to an 80/20 annexation. The district court held subsection 1 exclusively governs 80/20 annexations. Because subsection 1 does not mention the availability of a tax incentive, the court reasoned Dubuque was not entitled to offer a partial exemption from city property taxes to the property owners in the proposed territory. According to the district court, subsection 3, which explicitly grants city councils the right to offer such a benefit, only applies to 100% annexations. A careful reading of the statute does not support this conclusion.

---

[6]When an election to approve an involuntary annexation proposal is held, "registered voters of the [annexation] territory and of the city may vote, and the proposal is authorized if a majority of the total number of persons voting approves it." Iowa Code § 368.19 (2003).

[7]Section 368.7 has since been amended to include a fifth subsection. *See* Iowa Code § 368.7(5) (Supp. 2005). The legislature removed the provision for tax exemptions from subsections 2 and 3 and created subsection 5, which solely addresses tax exemptions.

## 1. Section 368.7(3) Applies to 80/20 Annexations

On its face, subsection 1 appears to be primarily concerned with 80/20 annexations.[8] But aside from the definitions of 80/20 and 100% voluntary annexations found in subsection 1, section 368.7 makes no express distinction between the two types of voluntary annexations. We must determine whether the remaining subsections apply to 80/20 annexations.

Subsection 2 governs an annexation of territory *not within* an urbanized area of another city. Subsection 3 governs an annexation of territory that is *within* an urbanized area of another city. A territory is "within an urbanized area" if it is within two miles of the boundaries of a city. *Id.* § 368.1(16) (Supp. 2003). Both subsection 2 and subsection 3 give a city council the discretion to include a property tax incentive in its resolution approving the annexation. Subsection 1, which defines an 80/20 annexation, contains no such provision. There is no indication subsections 2 and 3 only apply to 100% annexations and we do not read the statute so narrowly. Instead, we believe subsections 2 and 3 apply to both types of voluntary annexations—80/20 and 100% annexations. We read subsection 1 to simply provide additional requirements for an 80/20 annexation.[9] Thus, a city is entitled to offer a partial exemption from city property taxes with either type of voluntary annexation.

---

[8]For example, paragraph (*c*) requires a copy of the annexation application to be mailed to the "nonconsenting owner." Iowa Code § 368.7(1)(*c*). Paragraph (*d*) requires the annexation city to provide for a public hearing and give notice to "each owner of property located within the territory to be annexed who is not a party to the application"—i.e. to those who did not consent. Paragraph (*e*) allows a property owner who consented to annexation to withdraw his consent within three days after the public hearing with some exceptions. Paragraph (*f*) requires 4/5 of the CDB's members to approve an 80/20 annexation.

[9]We have previously held subsections 1 and 2 must be read together. In *City of Waukee v. City Development Board*, 590 N.W.2d 712 (Iowa 1999), we stated: "Although

Our interpretation of section 368.7 is consistent with the legislature's policy of promoting voluntary annexations. *Gorman*, 565 N.W.2d at 609 ("The purpose of section 368.7 is to avoid the costly and involved procedures governing involuntary annexations."). When a city begins the annexation process, it does not know whether all of the property owners will consent. Allowing a city to offer a partial tax exemption is a means to encourage property owners to consent to annexation. It is illogical to interpret the statute to require a city to first obtain the consents of all of the property owners in a territory before offering them a tax benefit. If one property owner refused to consent, then no property owner could receive a partial tax exemption. Such an outcome would frustrate the legislature's desire to help cities obtain consents by using property tax incentives as an inducement.

A recent amendment to section 368.7 supports the conclusion that a city can offer a partial exemption from city property taxes in both 80/20 and 100% annexations. Section 368.7 was amended in 2005 by Senate File 78.[10] 2005 Iowa Acts ch. 111, § 3. The legislature deleted the language pertaining to the transition of city property taxes from subsections 2 and 3 and created a fifth subsection. Subsection 5 provides:

> In the discretion of a city council, the resolution provided for in subsection 1, paragraph "*d*", or subsection 2 or 3, may include a provision for a transition for the imposition of city

---

section 368.7(1) does not expressly mention that parcels within the annexation territory be contiguous to one another, we think subsection 2 of section 368.7 imposes such a requirement. Subsection 2 prohibits approval of any annexation application 'which would create an island.'" *City of Waukee*, 590 N.W.2d at 717 (quoting Iowa Code § 368.7(2) (1995)).

[10]The amendment took affect May 5, 2005 and applies to an annexation application submitted to a city council on or after that date. 2005 Iowa Acts ch. 111, § 5.

> taxes against property within the annexation area as provided in section 368.11, subsection 3, paragraph "*m.*"

Iowa Code § 368.7(5) (Supp. 2005). The introduced version of Senate File 78 included an explanation for the amendment. It states "[t]he bill also *clarifies* that a city may include a provision for transition for imposition of city taxes in a resolution approving *any* voluntary annexation." (Emphasis added.) The word "any" as well as the reference to subsection 1 in the new subsection 5 makes clear the legislature intends the partial tax exemption to be available for both 100% and 80/20 voluntary annexations. More importantly, the explanation of the amendment indicates this was the legislature's intention prior to the amendment. When the legislature amends a statute, we generally presume it intended to change the statute's meaning. *Martin v. Waterloo Cmty. Sch. Dist.*, 518 N.W.2d 381, 383 (Iowa 1994). However, this presumption can be overcome by legislative history or by an explanation accompanying the amendment. *Id.; see Tiano v. Palmer*, 621 N.W.2d 420, 423 (Iowa 2001) ("Although ordinarily any material change in the language of a statute is presumed to alter the law, the time and circumstances of an amendment may indicate that the legislature merely intended to clarify the intent of the original enactment."); *State v. Schuder*, 578 N.W.2d 685, 687 (Iowa 1998) ("An amendment may be enacted so a statute corresponds 'to what had previously been supposed was the law rather than to effect a change therein.'" (quotation omitted)).

In the present case, the owners of more than 80% of the property in the proposed territory consented to Dubuque's annexation. The parties agree the proposed territory is within two miles of Asbury. Thus, section 368.7(3) applies to Dubuque's annexation. Subsection 3 allows a city council to transition the imposition of city property taxes as provided

in section 368.11(3)(*m*) for the property owners in the proposed territory. Iowa Code § 368.7 (referencing section 368.11(3)(*m*)). Section 368.11(3)(*m*) states:

> In the discretion of a city council, [it may provide] a provision for the imposition of city taxes against property within an annexation area. The provision shall not allow a greater exemption from taxation than the tax exemption formula schedule provided under section 427B.3, subsections 1 through 5, and shall be applied in the levy and collection of taxes.

The amount of exemption from city property taxes allowed under section 427B.3 (2003) is as follows:

1. For the first year, seventy-five percent.
2. For the second year, sixty percent.
3. For the third year, forty-five percent.
4. For the fourth year, thirty percent.
5. For the fifth year, fifteen percent.[11]

Dubuque's offer to the property owners follows this schedule exactly. Therefore, we hold Dubuque's offer to transition the imposition of city property taxes was proper in this case.

### 2. Dubuque may Distinguish between Consenting and Non-consenting Property Owners

The district court held that even if section 368.7(3) applies to 80/20 annexations, "the Code language does not provide that a city may discriminate between consenting and non-consenting landowners." The language of the Code does not support this interpretation.

Iowa Code section 368.11(3)(*m*) begins with the following phrase: "In the discretion of a city council, a provision for a transition for the imposition of city taxes against property within an annexation area." The district court's interpretation requires the addition of the word "all"—i.e.

---

[11]Cities may now transition property taxes over a period of ten years rather than five years. *See* Iowa Code § 368.11(3)(*m*) (Supp. 2005).

"In the discretion of a city council, a provision for a transition for the imposition of city taxes against [all] property within an annexation area." This we cannot do. We may not, under the guise of judicial construction, add modifying words to a statute or change its terms absent "inadvertent clerical errors or omissions which frustrate obvious legislative intent." *Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 49 (Iowa 1990). In this case, we find no such justification to alter the plain language of section 368.11(3)(*m*). Instead, this is a matter for the legislature. In fact, the legislature recently amended section 368.11(3)(*m*). 2006 Iowa Legis. Serv. 5 (West). The following sentence was added to the end of paragraph (*m*): "If the city council provides for a transition for the imposition of city taxes against a property in an annexation area, *all* property owners included in the annexation area must receive the transition upon completion of the annexation."[12] (Emphasis added.) In contrast to the amendment to section 368.7 just discussed, there is no indication by the legislature that it merely intended to clarify the statute as it existed at the time of the amendment. We presume the legislature meant to change section 368.11(3)(*m*). *Davis v. State,* 682 N.W.2d 58, 61 (Iowa 2004) (When interpreting an amendment, we presume "the amendment sought to accomplish some purpose and was not a futile exercise."). Therefore, pursuant to the versions of sections 368.7(3) and 368.11(3)(*m*) in effect at the time of this annexation, Dubuque was permitted to stipulate only consenting property owners would be eligible for a partial exemption from city property taxes.

"As an alternative basis to affirm the district court," Asbury claims Dubuque's "disparate treatment of non-consenting landowners violates

---

[12]This amendment became effective on July 1, 2006. 2006 Iowa Legis. Serv. 42 (West).

the due process and equal protection clauses of the United States and Iowa Constitutions." However, Asbury failed to articulate this claim in its brief and failed to address any specific application of due process and equal protection to this case. Accordingly, Asbury has waived this argument and we do not address it further. *See* Iowa R. App. P. 6.14(1)(*c*) ("Failure in the brief to state, to argue or to cite authority in support of an issue may be deemed waiver of that issue.").

## C. Availability of Other Financial Incentives

The district court also held Dubuque did "not have the authority under Chapter 368 of the Code of Iowa to offer the other financial benefits . . . ." The court stated:

> Nowhere does the statute provide that the City of Dubuque may offer consenting landowners deferral of payment for expenses for city services such as sewer or water hookup fees, or exemption from the costs of installation of city sewer or water lines.

Dubuque and the CDB argue this holding ignores Dubuque's home rule power. We agree.

In 1968, Iowa amended its constitution to give municipalities home rule authority. *See* Iowa Const. art. III, § 38A. Under the home rule amendment, a city has the "power and authority, not inconsistent with the laws of the General Assembly, to determine their local affairs and government, except that they shall not have power to levy and tax unless expressly authorized by the General Assembly." *Id.* Similarly, the Iowa Code provides:

> A city may, except as expressly limited by the Constitution of the State of Iowa, and if not inconsistent with the laws of the general assembly, exercise any power and perform any function it deems appropriate to protect and preserve the rights, privileges, and property of the city or of its residents,

and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents.

Iowa Code § 364.1 (2003).

Home rule power was intended to renounce the common law "Dillon rule." *City of Des Moines v. Master Builders of Iowa*, 498 N.W.2d 702, 703 (Iowa 1993) (referring to *Merriam v. Moody's Ex'rs*, 25 Iowa 163, 170 (1868), an opinion authored by Chief Justice John F. Dillon). Under the Dillon rule, cities were powerless to act in the absence of an express legislative grant of authority. *Id.* Home rule authority reversed this presumption by giving cities broad police powers, except they cannot impose taxes without the express authorization of the legislature. *Home Builders Ass'n of Greater Des Moines v. City of West Des Moines*, 644 N.W.2d 339, 345–46 (Iowa 2002).

As we have discussed, section 368.7 gives cities the discretion to provide a partial exemption from city property taxes to property owners in an annexed territory. The statute does not contemplate the offering of any other benefits. The district court in turn reasoned the city property tax incentive was the only benefit a city may offer property owners. But in its analysis, the district court asked the wrong question. The question is not whether a statute gives a city authority. Instead, the question is whether a statute forbids it. Nothing in chapter 368 forbids a city such as Dubuque from offering additional benefits. Without such a limitation, a city has the authority to offer other benefits, unless they are related to taxation, which does require an express authorization from the legislature. *See* Iowa Code § 364.3(4) (2003) ("A city may not levy a tax unless specifically authorized by a state law.").

We have previously defined a tax as "'a charge to pay the cost of government without regard to special benefits conferred,' meaning its

primary purpose is to raise revenue." *Kragnes v. City of Des Moines*, 714 N.W.2d 632, 639 (Iowa 2006) (quoting *Home Builders Ass'n of Greater Des Moines*, 644 N.W.2d at 346). In exercising its police power, a city may charge a citizen when it provides a service to that citizen. *Home Builders Ass'n of Greater Des Moines*, 644 N.W.2d at 347. The fee associated with that service is not a tax so long as it is the fair and reasonable cost of providing that service. *Newman v. City of Indianola*, 232 N.W.2d 568, 573–74 (Iowa 1975) (holding a city may charge a property owner the reasonable cost of extending an electrical transmission line to owner's property). In the present case, Dubuque offered to reduce the costs associated with extending water and sewer lines to the properties in the proposed territory. These are costs related to the conferral of "special benefits." Asbury never alleged these costs are more than the reasonable costs for such services. Consequently, these additional benefits are not tax-related. Thus, Dubuque does not need a special authorization by the legislature to offer these benefits. We therefore conclude all of Dubuque's proposed benefits were proper.

### D. Voluntariness of Consents

Finally, the district court held the property owners' consents were not voluntary because "Dubuque unfairly induced the property owners to the extent that it placed the property owners in a position of either agreeing to the annexation and receiving financial benefits, or being denied financial benefits for refusing to agree to the annexation . . . ." The court relied on *Hoepker v. City of Madison Plan Commission*, 563 N.W.2d 145 (Wis. 1997), a Wisconsin case, for this proposition. *See Hoepker*, 563 N.W.2d at 150 ("Municipalities cannot coerce or unfairly induce an elector and/or property owner into agreeing to annexation.").

Besides the differences in Wisconsin's and Iowa's annexation laws, there is one most obvious distinction between *Hoepker* and this case. In *Hoepker*, the property owners themselves alleged they had been coerced by the City of Madison into annexing their land. In the present case, the property owners are not seeking relief. Instead, Asbury, a competing city, is challenging Dubuque's annexation and relies on statements the property owners made to the CDB. This is not how one raises coercion or duress in Iowa. *But see Town of Fond du Lac v. City of Fond du Lac*, 126 N.W.2d 201 (Wis. 1964) (one municipality successfully arguing another municipality coerced residents into consenting to annexation).

The Agreement at issue is a contract. Dubuque offered several incentives to the property owners in the proposed territory in return for their consent to annexation. Based on the CDB's record, some property owners only grudgingly consented to annexation. Nevertheless, Dubuque rightly points out that none of the property owners rescinded their consent. Section 368.7(1)(*f*) allows a property owner to withdraw his consent within three business days after the public hearing "unless the property owner has entered into a written agreement for extension of city services or unless the right to withdraw consent was specifically identified and waived by the landowner." The Agreement states "[e]ach Property Owner agrees not to withdraw the application or any part thereof after its filing with the City Council." We need not decide whether the Agreement effectively waived the property owners' right to withdraw their consents under section 368.7(1)(*f*) because none of the property owners attempted to withdraw their consents within the nearly seven month time frame between executing the Agreement and the public hearing.

Essentially, Asbury is arguing the Agreement is voidable by reason of economic duress. In Iowa, a party claiming economic duress must prove the following elements: (1) a party involuntarily accepted the terms made by another party, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party. *Fees v. Mut. Fire & Auto. Ins.*, 490 N.W.2d 55, 59 (Iowa 1992) (citing *Turner v. Low Rent Hous. Agency*, 387 N.W.2d 596, 598–99 (Iowa 1986)). Assuming *arguendo* duress can be proven, Asbury is not in position to make that argument. We follow the Restatement's rule concerning the effect of duress on the enforceability of a contract: "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable *by the victim.*" *Turner*, 387 N.W.2d at 598 (quoting Restatement (Second) of Contracts § 175(1), at 475 (1981)) (emphasis added). Asbury cannot be the victim because it is not a party to the Agreement. The property owners who are parties to the Agreement have neither joined this lawsuit nor withdrawn their consents. As it stands, Asbury may not allege coercion on behalf of the property owners. Consequently, it was error to conclude Dubuque coerced the property owners into consenting to annexation.

### IV. Conclusion

In sum, we find Dubuque substantially complied with Iowa law in its annexation of the land in question. We reverse the district court and affirm the CDB's decision. Section 368.7(3) allows Dubuque to offer a partial exemption from city property taxes in an 80/20 annexation. At the time of the annexation, Iowa law did not require Dubuque to give all property owners in the proposed territory the property tax incentive.

Consequently, Dubuque was permitted to condition the partial tax exemption on consent to annexation. Pursuant to home rule power, Dubuque properly offered additional incentives, such as reduced cost for sewer hook-up, to the property owners. Finally, Asbury may not allege on behalf of property owners in the proposed territory that the property owners' consents to annexation are voidable due to economic duress.

**REVERSED.**

All justices concur except Hecht, J., who takes no part.